Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Respondent,

v.

Demetrius M. Bᴏʏᴅ, Defendant-Appellant.†

Court of Appeals

*No. 2010AP1090–CR. Submitted on briefs January 5, 2011.
—Decided January 25, 2011.*

2011 WI App 25

(Also reported in 797 N.W.2d 546.)

† Petition for Review denied 5/24/11.

700

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Rebecca R. Lawnicki* of *Henak Law Office, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Thomas J. Balistreri*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Demetrius M. Boyd appeals a judgment convicting him of twenty crimes (three counts of armed robbery with threat of force as party to a crime and as an habitual criminal, *see* Wis. Stat. §§ 943.32(2), 939.05, 939.62; driving someone else's car without the owner's consent and while having a dangerous weapon as party to a crime and as an habitual criminal, *see* Wis. Stat. §§ 943.23(1g), 939.05, 939.62; unlawfully possessing a firearm as a convicted felon, as an habitual criminal, *see* Wis. Stat. §§ 941.29(2)(a), 939.62; unlawfully possessing a short-barreled shotgun as an habitual criminal, *see* Wis. Stat. §§ 941.28(2), 939.62; driving someone else's car without the owner's consent as an habitual criminal, *see* Wis. Stat. §§ 943.23(3), 939.62; ten counts of felony bail jumping as an habitual criminal, *see* Wis. Stat. §§ 946.49(1)(b), 939.62; battery, *see* Wis. Stat. § 940.19(1); unlawfully and intentionally pointing a firearm at another person, *see* Wis. Stat. § 941.20(1)(c); and resisting or obstructing a law enforcement officer, *see* Wis. Stat. § 946.41(1)). He also appeals the circuit court's denial of his motion for postconviction relief.[1] He claims that he is entitled to a

---

[1] The Honorable Jeffrey A. Conen presided over Boyd's trial and sentenced him. The Honorable Jeffrey A. Wagner denied Boyd's postconviction motion. The notice of appeal recites that, in addition to appealing the order denying his motion for postconviction relief, Boyd is appealing "from the final amended judgment of conviction entered in this matter on July 30, 2008."

new trial because: (1) the trial court should have given him a new lawyer when he complained about his trial lawyer; and (2) he contends that his trial lawyer gave him constitutionally deficient representation. He also argues that convicting him on bail-jumping counts based on criminal acts for which he was also convicted violated his double-jeopardy rights. Finally, he asserts that the circuit court should have granted him an evidentiary hearing on the issues he raised in his postconviction motion. We affirm.

## I.

¶ 2. The jury convicted Boyd of crimes involving four victims. The jury found that Boyd and two associates robbed Abdel Hussein, Basil Awieus, and Monged Asad with a sawed-off shotgun shortly after 9:00 p.m. on January 3, 2008. The jury also found that Boyd battered Lanita Skinner, the mother of Boyd's son, and threatened her with a shotgun several hours after the January 3 robbery.[2]

¶ 3. Hussein told the jury that he had just closed the liquor store where he worked and was in the store's parking lot with Awieus, his uncle, and Asad, his cousin, when three men drove into the parking lot in a van,

There are, however, three judgments of conviction: one dated July 30, 2008, one dated July 31, 2008, and an amended judgment of conviction dated January 12, 2010. The notice of appeal's flawed reference does not, however, affect our jurisdiction. *See* Wis. Stat. § 808.04(8) ("If the record discloses that the judgment or order appealed from was entered after the notice of appeal or intent to appeal was filed, the notice shall be treated as filed after that entry and on the day of the entry.").

[2] Boyd was also charged with battering Skinner in December of 2007, and with bail-jumping as a result of that incident, but the jury acquitted him of those charges.

704

jumped from the van, and, armed with a shotgun, took things from their pockets and Hussein's black Nissan Maxima. The testimony of Awieus and Asad was essentially the same, and surveillance tapes of the parking lot substantiated their testimony. None of the men could identify any of the robbers, however, because they wore masks.

¶ 4. Boyd's two accomplices also testified about the robbery, and supported the victims' testimony. One, Dennis Nickelson, told the jury that he, Kenyarie Washington, and Boyd were driving around in the van looking for someone to rob. According to Nickelson, the robbery was Boyd's idea. When they arrived at the store, Boyd gave the shotgun to Nickelson, who held it while Washington told everyone to get on the ground. Washington took Hussein's Maxima, and Nickelson and Boyd went to Nickelson's house. The three of them met up later and drove with Skinner to where Boyd wanted Skinner to rob her sister's boyfriend, which Skinner told the jury was her idea to divert Boyd's attention from her because he had been hitting her. They were in Hussein's Maxima and Boyd was driving. Skinner said that when Boyd became frustrated because she did not get the money, he threatened her with the shotgun, and that she soiled herself from fear. Washington's testimony was similar to that of Nickelson and Skinner.

¶ 5. As luck would have it, a police officer, Michael Vagnini, later saw Hussein's Maxima run through a stop sign, and tried to stop the car. After chasing the Maxima at speeds reaching some eighty miles per hour, Vagnini told the jury that a man jumped from the car while it was still moving, albeit slowly, and, after a foot chase, Vagnini caught him. The man was Boyd. When captured, Boyd had Hussein's credit and debit cards and Hussein's driver's license, and also Asad's check and credit cards.

705

¶ 6. After his arrest, Boyd voluntarily gave the police a DNA sample. A technician employed by the State Crime Laboratory testified that she matched Boyd's sample to DNA found on the Maxima's steering wheel.

¶ 7. Boyd testified and denied all the charges. He told the jury that he was just standing around when Vagnini stopped the Maxima, which he denied driving, and that the officers planted the victims' property on him. He admitted, however, that he had earlier told the police that he was in the Maxima with two other men who gave him the victims' cards, testifying that he told the police "several different stories" about the cards. He also claimed that he was at Skinner's house "an hour of 9:00" the night of January 3. He denied knowing Nickelson. As we have seen, the jury convicted Boyd on all charges except the one alleging that he battered Skinner in December of 2007 and the underlying bail-jumping charge. We now turn to his contentions on appeal.

## II.

A. *Boyd's request for a new lawyer.*

¶ 8. Although, with exceptions not material here, persons have the right to retain counsel of choice, indigent defendants in criminal cases may not select the lawyers who represent them. *State v. Jones*, 2010 WI 72, ¶¶ 38–42, 46, 326 Wis. 2d 380, 407–410, 412, 797 N.W.2d 378. An indigent defendant does, however, have the right to a lawyer with whom he or she can communicate effectively. *Id.*, 2010 WI 72, ¶ 25, 326 Wis. 2d at 397–398, 797 N.W.2d at 578. When an indigent defendant seeks a new lawyer because of an alleged breakdown in their communication, the trial court must consider two fac-

tors: (1) whether the request for a new lawyer is timely, and (2) " 'whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.' " *Ibid.*, (quoted source omitted). A request for a new lawyer is timely if it is made when the "total lack of communication" becomes evident, even though that might be on the eve of trial. *Id.*, 2010 WI 72, ¶ 30, 326 Wis. 2d at 401–402, ___ N.W.2d at ___. A trial court has discretion to deny a indigent defendant's request for a new lawyer, and we will uphold the trial court's decision if it " 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.' " *Id.*, 2010 WI 72, ¶ 23, 326 Wis. 2d at 397, ___ N.W.2d at ___ (quoted source omitted). Thus, we must assess " 'the adequacy of the [trial] court's inquiry into the defendant's complaint.' " *Id.*, 2010 WI 72, ¶ 25, 326 Wis. 2d at 397–398, ___ N.W.2d at ___ (quoted source omitted). Although we review *de novo* whether the trial court correctly applied the applicable law, *see State v. White*, 2008 WI App 96, ¶ 9, 312 Wis. 2d 799, 806, 754 N.W.2d 214, 218, a trial court's findings of fact are binding on us unless they are "clearly erroneous," *State v. Johnson,* 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990), and those findings may be implicit in the trial court's ultimate conclusion, *Schneller v. St. Mary's Hosp. Med. Ctr.,* 162 Wis. 2d 296, 311, 470 N.W.2d 873, 879 (1991).

¶ 9. Boyd asserts that the trial court erred in not letting him have a new lawyer, contending that it applied the wrong standard (whether the lawyer was giving Boyd ineffective representation, rather than whether

there was the requisite complete breakdown in communication). As explained below, we disagree.

¶ 10. Boyd asked for a new lawyer twice: five days before the trial and during the trial. We look at each in turn.

1. *Boyd's request five days before trial.*

¶ 11. The first time Boyd told the trial court that he wanted a new lawyer was when it appeared that a police officer whom the State had subpoenaed and the defense wanted to call as a trial witness was going to be out of the country when the trial was scheduled. The State and Boyd's lawyer agreed that the officer's testimony would be preserved by deposition. *See* WIS. STAT. § 967.04. Boyd told the trial court that he preferred to have the officer testify in front of the jury at the trial, and offered to waive his right to a speedy trial. He complained that he first learned the previous evening that the trial court would hold a hearing to see whether the officer's testimony should be taken by deposition. He said that he "would have liked to have known about, you know, him taking this trip at least 30 days before hand so we could have prepared for this." He added that "it was just on short notice, and I'm afraid I don't feel comfortable." The trial court ordered that the officer's testimony be preserved by deposition.[3]

---

[3] Boyd does not point us to anything he would have done differently if he had the "30 days" advance notice, or, for that matter, how he was prejudiced by the deposition procedure. As it turned out, the officer was available to testify at the tail end of the trial but did not. Boyd does not assert that he was prejudiced by that either.

¶ 12. At the end of the hearing on whether to preserve the officer's testimony by deposition, Boyd's lawyer told the trial court, "I don't know if my client has concerns about my representation or not." When the trial court asked Boyd whether he wanted a new lawyer, Boyd responded, "Yeah, sure." When asked to explain, Boyd said: "Me and my attorney is having a lot of conflict issues." The trial court then asked:

> What type of conflicts? I don't want to know specifically, because that's attorney/client privilege. So I don't want to know specifically what you have discussed.
>
> Does it have to do with strategy? Does it have to do with the fact that somebody is calling somebody names? Does it have to do with the fact that there is [*sic*] personality conflicts? The rest of it I don't want the specifics, and I don't care to know about the specifics.

Boyd responded, "Basically that's about it." The trial court denied Boyd's request, and noted the following:

- Boyd insisted on testifying at his preliminary examination, and the trial court reflected that this was not only rare but also not in Boyd's interest. "It appears that you're the one that is pulling the strings here and calling the shots as it is."[4]

---

[4] Judge Conen presided over Boyd's preliminary examination as well as the trial. After the State rested at the preliminary examination, Boyd's lawyer (who also represented Boyd at the trial) explained why he was calling Boyd as a witness. We reprint the pertinent colloquy in full because it reveals that the trial court was familiar with Boyd's interaction with his trial lawyer.

> [Boyd's trial lawyer]: I know this is highly unusual where the defendant takes the stand at a preliminary hearing. I advised that my client — I had a very long conversation last night at the House of Corrections with Mr. Boyd about the ramifications of him

- That if Boyd had differences with his lawyer over strategy, it was "within reason" for the lawyer "to make decisions of what is appropriate as far as making tactical decisions," and that "[i]f you think that you know better, and you want to put on certain evidence, or continue to pursue this case in a specific way, then I guess you can make those suggestions to him."

The trial court then ruled, in what Boyd contends was a flawed analysis under *Jones* and its antecedents:

> Everything that I have seen so far throughout the course of the representation that has been going on here has indicated that your lawyer has worked ex-

taking the stand. I advised him of the possible negative consequences to his case. I advised him of the risks he's taking. I advised him that he has the right to remain silent, that he doesn't have to testify, and he is not being forced to do so. I believe Mr. Boyd is making this decision on his own free will. And I believe he's doing it against my advice.

THE COURT: Mr. Boyd, do you understand that you have the right to remain silent?

WITNESS: Yes, I do.

THE COURT: And do you understand that when you testify here today that you pretty much have extinguished that right to remain silent in advance of the trial; do you understand that?

A Yes.

Q You don't have the opportunity to really decide on the day of trial whether you are going to testify or not any longer. It does not mean that you could be called and forced to testify on the day of trial, but anything that has been brought up today and anything that has been discussed with you even on direct examination, as well as cross examination, can be brought up to the jury at that time. Do you understand that?

A Yes, sir.

Q And this is something you wish to do?

A Yes.

710

tremely hard and diligently in preparing this case. At the final pretrial we had a long discussion about preparation and what needs to be done in this case and how it needs to move along, and I have seen nothing in this matter so far that indicates any deficient performance.

My thoughts are that the attempt to fire your lawyer is nothing more than a delayed [*sic*] tactic, so that is not going to be allowed.

¶ 13. Boyd argues that by using the phrase "deficient performance," the trial court applied the wrong test and did not assess whether Boyd and his lawyer had a conflict that was " 'so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.' " *See Jones*, 2010 WI 72, ¶ 25, 326 Wis. 2d at 397–398, ___ N.W.2d at ___ (quoted source omitted). The very analysis that *Jones* tells us is required, however, negates Boyd's contention: a "total lack of communication" between a lawyer and his or her client is one that " 'prevent[s] an adequate defense and frustrate[s] a fair presentation of the case.' " *Ibid.* (quoted source omitted). Thus, even though a trial court does not make an exhaustive "full inquiry," its decision to not permit an indigent defendant to get a new lawyer will not be overturned when the Record is devoid of evidence " 'of a conflict that made counsel's continued representation *untenable.*' " *State v. McDowell*, 2004 WI 70, ¶ 73, 272 Wis. 2d 488, 525, 681 N.W.2d 500, 518 (adopting State's analysis) (emphasis added). Mere disagreement over strategy does not suffice. *Id.*, 2004 WI 70, ¶ 75, 272 Wis. 2d at 526, 681 N.W.2d at 518. The crux, as the trial court's brief analysis of Boyd's conclusory complaint recognized, is whether the alleged conflict "prevented an adequate defense." *See ibid.* Signifi-

cantly, Boyd has not shown, other than by mere assertion, how the alleged problems he was having in communicating with his trial lawyer either prejudiced his defense or, in the words of *McDowell* quoted earlier, made the lawyer's "continued representation untenable." *See id.*, 2004 WI 70, ¶ 73, 272 Wis. 2d at 525, 681 N.W.2d at 518 (internal quote marks and quoting source omitted). The trial court thus applied the appropriate standard and did not erroneously exercise its discretion in concluding that the disagreements Boyd had with his trial lawyer did not warrant giving Boyd a new lawyer. Accordingly, a remand for a retrospective hearing is not required. *See State v. Lomax,* 146 Wis. 2d 356, 365, 432 N.W.2d 89, 93 (1988) ("When a trial court has not made an adequate inquiry into a defendant's last-minute request to discharge appointed counsel, a retrospective hearing, at which the defendant may present whatever he deems necessary to fully articulate his reasons for wanting counsel discharged, strikes a proper balance between the constitutional rights of defendants and the efficient administration of justice.").

2. *Boyd's request during trial.*

¶ 14. The second time Boyd told the trial court that he wanted a new lawyer was during the examination at trial of Detective David Lopez, who took a sample of Boyd's DNA with Boyd's consent. The dispute focused on questions that Boyd wanted his lawyer to ask Lopez and the lawyer's reasons for not asking them. The following is the pertinent colloquy. The jury was not present:

> [Boyd's trial lawyer]: My client wanted me to ask the detective, and I explained to him why I felt that

those were not appropriate questions and unnecessary and not a good strategic decision.

He disagrees with me. He wants to ask the question. I then asked him if he wanted to represent himself because I wasn't going to be asking those questions and he indicated that he would like to represent himself and ask his own questions.

THE COURT: So what are the questions?

[Boyd's trial lawyer]: The first question that he wanted me to ask was are you required to record such a procedure [for taking a DNA sample]. I explain [sic] to him that that's exactly what the detective already testified to.

Did you — the second question, did you explain to Mr. Boyd why you were requesting his DNA. I didn't feel that was a necessary question because then that would go into the 22 counts again and I thought it would be prejudicial to his case.

The third question was how much time did you spend with Mr. Boyd. I didn't think that was necessarily a question that needed to be asked.

And, number four, did you question Mr. Boyd about the charges. Again, I didn't want to bring up the 22 charges. I think it hurts his case every time we talk about 22 charges being brought against him. I didn't feel that any of these questions were in his best interest to ask and I wanted the detective off the stand as quickly as possible.

THE COURT: Mr. Boyd, you have a lawyer. Your lawyer is going to run the trial as he sees fit. He's the one that went to law school. So that's what we're going to do.

THE DEFENDANT: Your Honor, may it please the Court.

THE COURT: Sure.

713

THE DEFENDANT: My attorney — my attorney, he instruct me, he said write down these questions that I may have for anybody who takes the stand.

THE COURT: Okay.

THE DEFENDANT: I feel like — I feel as though some of these questions are important that would lead to — they will lead to — I believe that I'm very concerned about the integrity of the evidence, the DNA. I understand that I did give my consent. I did understand that the documents that were presented in court showed that I signed my consent, but there was no video or audio recording. That's a procedure that I understand that is usually taken when detectives or someone of that profession is collecting DNA.

THE COURT: I don't think it is. I've never heard of that. I've heard of taking statements that have to be recorded now, but I've never heard audio or video being taken of DNA samples.

The trial court then explained that Boyd would have to defer to his lawyer's decisions on strategy. Boyd responded by saying that he felt that he "may need to plea or somethin' because it's not workin' between me and my attorney. My attorney may not want to represent me to the best of my interest because of the conflict of interest between us." The trial court appropriately asked Boyd to explain:

What's the conflict of interest then? We're in the middle of a trial at this point. I'm not going to have him removed from the trial unless it's really bad. If he beat you. If he out and out lied to you about everything that went on with this trial.

THE DEFENDANT: Yes, he have [sic] lied and I have documentation. He has sent me letters, I mean in black and white, stipulatin' that he has filed motions with the Court to be heard and he's just waiting to hear

714

back from the Court. I have these letters. I have no problem bringing them to court to show proof they're from him. The motions was [sic] never filed. As a matter of fact, when we had the hearing about the deposition hearing, he told me that day, okay, I lied. I didn't file the motions. But, you know, you lied to me for the past two months and you told me several times that you filed the motion. You was just playin' it by ear. You was waitin' for the Court to give us a date to hear the motion. I'm very concerned about this man defendin' me, Your Honor. I believe he has —

THE COURT: What motions are we talking about?

Boyd's lawyer said that it was a motion to lift some of Boyd's jail restrictions, and that he would file the motion if Boyd wanted him to. "I wasn't in the Courthouse for several weeks. We had a subsequent meeting. He told me, I'm fine, or don't worry about it, so I didn't file it." (Formatting altered.) Boyd responded, "Your Honor. That is — that's totally not true." When the trial court said that the jail matter did not concern the trial itself, Boyd added that his trial lawyer also did not ensure that Skinner's cell phone, which Boyd had when he was arrested, would be available to show pictures that Boyd said proved that he was elsewhere when the victims were robbed. His trial lawyer explained that the cell phone belonged to Skinner and that the police returned it to her:

> I sent out an investigator to see if they [sic] could get the cell phone. They were unsuccessful. I didn't think — Mr. Boyd told me there was a motion that I could file. But I was not aware of a motion I could file to dismiss the case because the State failed — because the State released evidence prematurely and we didn't have a right to discover.

715

Boyd then said that the cell phone belonged to Skinner's sister, and that he didn't "blame my attorney for not bein' able to obtain the cell phone because I understand that he wasn't the one who made the order of the release of the cell phone." After further colloquy about the cell phone and whether it would show that Boyd was somewhere else when the victims were robbed, Boyd again explained why he did not want the trial lawyer to represent him:

> THE DEFENDANT: I totally feel like this man is not going to represent me to the best of my interest. He has already told me he's going to make sure that I have no appellate issues. Now, have you not said that?
>
> [Boyd's trial lawyer]: I was going to make sure he had a fair trial and that we wouldn't leave any stone unturned. That's exactly what I said to him.

Boyd then listed other matters that he said made him uncomfortable with his trial lawyer:

- "He called me an idiot. I called him names, of course. We went back and forth."

- The trial lawyer's investigators hadn't come up with any exculpatory evidence.

The trial court refused to dismiss Boyd's trial lawyer, noting that Boyd's "credibility with the Court is pretty much minimal." Later in the colloquy, Boyd repeated that he did not "believe this man is going to represent me to the best of his interest — I mean my interest." The trial court responded: "I believe he's doing an excellent job that I can tell right now." Boyd then repeated that he "may want to enter a plea of no contest because, Your Honor, basically I see right now at this time I can't excuse this counsel from the case." He accused the lawyer of being a "doormat for the prosecutor's office."

716

¶ 15. The State said that it "would . . . encourage the Court not to accept a no contest plea," and the trial court said that it would not accept one. After expressing a concern that Boyd was trying to create an ineffective-assistance-of-counsel issue, the trial court opined that it was not going to get into that matter in the middle of the trial. It then asked Boyd's trial lawyer whether he "believe[d] that you're in a position to properly represent your client at this time and try this case?" The lawyer responded:

> Your Honor, I fully investigated this case. I've spent countless hours preparing for trial. I've spent time with my client discussing this case. I don't care about his mental status. I operate as an officer of this Court who is defending him. My interest is to defend him. It always has been. I've discussed my concerns in several letters with him regarding this case and his desire to proceed to trial so my desire is to proceed to trial. I don't have any conflict of interest with him. I've simply advised him of the difficulties that this trial is going to have, but I've always maintained my steadfast and diligent effort to defend him and I'm not operating in behalf of the State in this case, I'm operating on his behalf.

When Boyd again asked whether he would be allowed to ask witnesses the questions he wanted to ask, the trial court repeated that that was his lawyer's decision and that it was not going to get into an ineffective-assistance-of-counsel analysis in the middle of the trial. Finally, the trial court opined that it saw what Boyd was attempting to do as "nothing more . . . than a delay tactic."

¶ 16. As he did with his complaint about the trial court not letting him have a new lawyer that we discussed in Part 1 of this subsection, Boyd focuses on

717

the trial court's reference to Boyd's possible ineffective-assistance-of-counsel claims and argues that the trial court thus applied the wrong legal standard. But, here, as with the matter we discussed in Part 1 of this subsection, Boyd has not shown that he had such a disagreement with his trial lawyer that it was the type of " 'conflict that made counsel's continued representation *untenable.*' " *See McDowell*, 2004 WI 70, ¶ 73, 272 Wis. 2d at 525, 681 N.W.2d at 518 (quoted source omitted) (emphasis added). Indeed, other than conclusory assertions that his trial lawyer was not representing the "best of my interest," Boyd's unhappiness with his trial lawyer focused on questions he wanted to ask, and, as described in Part 1 of this subsection, whether a witness's testimony should have been preserved by deposition. As we have already seen, however, a mere disagreement over strategy does not suffice. *Id.*, 2004 WI 70, ¶ 75, 272 Wis. 2d at 526, 681 N.W.2d at 518. Boyd has pointed to nothing that demonstrates a breakdown so serious that it " 'resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.' " *See Jones*, 2010 WI 72, ¶ 25, 326 Wis. 2d at 397–398, ___ N.W.2d at ___ (quoted source omitted). The trial court did not erroneously exercise its discretion in denying Boyd's second request for a new lawyer, and a remand for retrospective hearing is not required. *See Lomax*, 146 Wis. 2d at 365, 432 N.W.2d at 93.

B. *Boyd's contention that his trial lawyer gave him constitutionally deficient representation.*

¶ 17. Boyd claims that his trial lawyer's representation was constitutionally deficient in four respects and that the postconviction circuit court erred in not giving him a hearing under *State v. Machner*, 92 Wis. 2d

797, 285 N.W.2d 905 (Ct. App. 1979) (hearing to determine whether lawyer gave a defendant ineffective assistance). We address his contentions after we set out the overall governing standard.

¶ 18.　To establish constitutionally deficient representation, a defendant must show:　(1) deficient representation; and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient representation, a defendant must point to specific acts or omissions by his or her lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Id.*, 466 U.S. at 687. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. This is not, however, "an outcome-determinative test. In decisions following *Strickland*, the Supreme Court has reaffirmed that the touchstone of the prejudice component is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " *State v. Smith*, 207 Wis. 2d 258, 276, 558 N.W.2d 379, 386 (1997) (citations and quoted source omitted). We need not address both aspects of the *Strickland* test if the defendant does not make a sufficient showing on either one. *See Strickland*, 466 U.S. at 697.

1. *Trial lawyer's alleged violation of Boyd's attorney-client privilege.*

¶ 19. Boyd complains that his trial lawyer's explanations to the trial court in the instances we have already recounted in the immediately preceding section violated Boyd's attorney-client privilege because, as he writes in his main brief on this appeal, the lawyer "divulged privileged information." Other than general assertions, Boyd specifies nothing that is protected by the attorney-client-privilege shield.[5]

¶ 20. First, the privilege only encompasses confidential communications from the client to the lawyer, *Journal/Sentinel, Inc. v. School Bd. of School Dist. of Shorewood*, 186 Wis. 2d 443, 460, 521 N.W.2d 165, 173 (Ct. App. 1994), and those communications from the lawyer to the client if their disclosure " 'would directly or indirectly reveal the substance of the client's confidential communications to the lawyer,' " *Lane v. Sharp Packaging Systems, Inc.*, 2002 WI 28, ¶ 40, 251 Wis. 2d 68, 104, 640 N.W.2d 788, 804 (quoted source omitted). Second, a communication is "confidential" under the rule only if it is "not intended to be disclosed to 3rd

---

[5] WISCONSIN STAT. RULE 905.03(2) sets the general rule:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.

persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." WIS. STAT. RULE 905.03(1)(d). Thus, questions Boyd wanted to ask Detective Lopez were not "confidential" because they would have been revealed by the asking, which is what Boyd wanted. Similarly, Boyd's objection to taking the witness's testimony by deposition was also not "confidential" because Boyd wanted the trial court to know that he objected.

¶ 21. Third, and of special significance here, it is settled that a criminal defendant waives the attorney-client privilege by claiming that his or her lawyer was constitutionally deficient. *State v. Flores*, 170 Wis. 2d 272, 277–278, 488 N.W.2d 116, 118 (Ct. App. 1992) ("[W]hen a defendant charges that his or her attorney has been ineffective, the defendant's lawyer-client privilege is waived to the extent that counsel must answer questions relevant to the charge of ineffective assistance. Section 905.03(4)(c), Stats., specifically states that there is no lawyer-client privilege '[a]s to a communication relevant to an issue of breach of duty by the lawyer to his [or her] client or by the client to his [or her] lawyer.' ") (all brackets except the first pair by *Flores*). Although no Wisconsin case has yet considered the issue (and we have found none from other jurisdictions), we believe that this common-sense application of the attorney-client privilege applies with equal force when a defendant in a criminal case claims that he or she cannot effectively communicate with his or her lawyer—otherwise no court (either *nisi prius* or reviewing) could assess whether there was, as phrased by *Jones*, " 'a total lack of communication' " between them.

*Jones*, 2010 WI 72, ¶ 25, 326 Wis. 2d at 397–398, ___ N.W.2d at ___ (quoted source omitted). Stated another way, unless the attorney-client privilege gave way in connection with confidential client-to-lawyer communications that are material as to whether there was "a total lack of communication" between them, reviewing courts would be bound by a defendant's sheer assertion. Indeed, WIS. STAT. RULE 905.03(4)(c) tells us that the attorney-client privilege does not apply "to a communication relevant to an issue of breach of duty by the lawyer to the lawyer's client or by the client to the client's lawyer"; a lawyer's unremedied failure to effectively communicate with a client is such a breach of duty.

¶ 22. Boyd contends, however, that *State v. Meeks*, 2003 WI 104, 263 Wis. 2d 794, 666 N.W.2d 859, requires a different result. We disagree.

¶ 23. The issue in *Meeks* was whether a lawyer could testify about her "opinions, perceptions, and impressions relating to a former client's mental competency" when the client's competency was in issue. *Id.*, 2003 WI 104, ¶ 2, 263 Wis. 2d at 798, 666 N.W.2d at 861. Holding that the lawyer could not so testify, *Meeks* engrafted on WIS. STAT. RULE 905.03, the lawyers' ethical duties set out in SCR 20:1.6, *Meeks*, 2003 WI 104, ¶ 60, 263 Wis. 2d at 823, 666 N.W.2d at 873–874, and determined that the lawyer's views of her client's competency necessarily was based on matters encompassed by the privilege, *id.*, 2003 WI 104, ¶ 54, 263 Wis. 2d at 821, 666 N.W.2d at 873. Unlike the situation here, however, there was no claim in *Meeks* that the confidential communications were material to an alleged breach of the lawyer's duties to her client. Thus, and in light of *Meeks*'s application of SCR 20:1.6 to the attorney-client privilege, it is significant that SCR 20:1.6(c)(4), similar

to Wis. Stat. Rule 905.03(4)(c), provides that "[a] lawyer may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary . . . to establish a . . . defense on behalf of the lawyer in a controversy between the lawyer and the client . . . *or to respond to allegations in any proceeding concerning the lawyer's representation of the client.*" (Emphasis added.)

¶ 24. Boyd has not pointed to anything in this Record that shows that his trial lawyer violated Boyd's attorney-client privilege.

2. *The trial lawyer's request for a brief recess to research the law.*

■■■

¶ 25. In the middle of Boyd's testimony on cross-examination, his lawyer asked for a brief recess to research the law.

> [Boyd's trial lawyer]: Your Honor, I need to ask for a brief recess at this point. I need to address some legal issues.
>
> THE COURT: Okay. Why don't we send the jury out.
>
> THE BAILIFF: All rise for the jury.
>
> (Whereupon the following proceedings were held in the absence of the jury.)
>
> [Then there was a brief non-material colloquy with a lawyer from Boyd's trial lawyer's firm.]
>
> [Boyd's trial lawyer]: I just need a brief 10 minutes to do some legal research.
>
> THE COURT: Okay.

[Boyd's trial lawyer]: I would prefer not to discuss the issue at this point, I think it's an attorney-client issue.

THE COURT: Okay. Go ahead.

After the recess and before the jury returned, Boyd's trial lawyer and the trial court put the matter on the Record.

[Boyd's trial lawyer]: In the middle of the testimony I had concerns about my own duties as to my client after hearing his testimony, I did a little bit of research, and I concluded that the only things that I could advise my client of were that there is a penalty for perjury and that the Fifth Amendment is no longer able to be invoked. I discussed that with him and I believe he understands that at this point and we're prepared to continue on with testimony.

THE COURT: All right. Just so the record is clear then, there was no discussion of specific testimony, I'm not — I know it's attorney-client privilege, but what I'm concerned about is the fact that it may appear as though you were telling your client what to say and that is not the case; is that correct?

[Boyd's trial lawyer]: That is not the case. I simply discussed with him perjury and the Fifth Amendment and left it at that.

THE COURT: That's fine.

[Boyd's trial lawyer]: I believe he is fully advised.

THE COURT: It's more for appearance sake than anything else, we've discussed it in chambers and I am satisfied that that didn't go on, but I want to make sure that there is a record that that did not happen for appearance sake.

Pointing out that the request by Boyd's trial lawyer for a recess came immediately after the following question and answer on cross-examination, Boyd argues that his lawyer somehow telegraphed to the jury by his request for a recess that the lawyer believed that Boyd was committing perjury:

Q So, in any event, going back to what was going on there on Booth Street [where the Maxima stopped after Officer Vagnini chased it] did you see anybody get out of the car or no?

A No, I did not.

Q And that's totally contrary to everything that you have told this tribunal in the past; isn't that true?

A Well, the thing about me seeing somebody get out [of] the car would be almost impossible, because from the angle the car stopped and they got out at, I couldn't see no — I couldn't see the driver or passenger door.

As the Record shows, however, there is no way the jury could have perceived from his trial lawyer's request that the lawyer was concerned that Boyd was committing perjury. Insofar as Boyd's trial lawyer revealed that matter to the trial court outside of the jury's presence, Boyd does not show how, under the *Strickland* standard, he was prejudiced, and that ends the matter.

3. *The trial lawyer's failure to request a hearing as to whether he and Boyd had a complete breakdown in their communications.*

¶ 26. Boyd contends that his trial lawyer was constitutionally deficient because the lawyer did not seek an evidentiary hearing on whether he and Boyd had a complete breakdown in their communications. As

we have already analyzed earlier in this opinion, the Record shows that there was no evidence of such a breakdown to warrant a hearing. Thus, Boyd's trial lawyer was not constitutionally deficient for not asking for that hearing. *See State v. Golden*, 185 Wis. 2d 763, 771, 519 N.W.2d 659, 662 (Ct. App. 1994) (A defendant is not prejudiced under the *Strickland* standard when the lawyer does not make a motion that would have been denied.).

> 4. *Facts underlying Washington's prior convictions.*

¶ 27. As is required under application of WIS. STAT. RULE 906.09, the jury was allowed to hear that Washington had previously been convicted of two crimes. Boyd faults his trial lawyer, however, for not seeking to adduce that, as phrased by his main brief on this appeal, that: "Washington had pled guilty to and been convicted of crimes very similar to the ones at issue at trial: operating a motor vehicle without the owners [*sic*] consent . . . In both cases, Washington allegedly stole cars, either as the driver or the passenger." Wisconsin does not, of course, permit such an inquiry under RULE 906.09. *See Voith v. Buser*, 83 Wis. 2d 540, 546, 266 N.W.2d 304, 307 (1978). Nevertheless, Boyd argues that his trial lawyer should have sought under WIS. STAT. RULE 906.08(2) to cross-examine Washington about the specifics of those crimes. RULE 906.08(2) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than a conviction of a crime or an adjudication of delinquency as provided in s. 906.09, may not

726

be proved by extrinsic evidence. They may, however, subject to s. 972.11(2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

Although it may be true (a matter that we do not decide) that, as Boyd writes in his main brief on appeal, Washington could have been asked about his earlier brushes with the law "without referencing whether [they] resulted in a conviction," *see State v. Boehm*, 127 Wis. 2d 351, 358, 379 N.W.2d 874, 878 (Ct. App. 1985) (not mentioning an apparent conflict with WIS. STAT. RULE 906.09), the jury already knew that Washington was in custody for the January 3 armed robbery, and that he took the Maxima from the liquor store parking lot, and that he actively confronted the armed-robbery victims. The additional damage to Washington's credibility would have been minimal. Boyd has not established *Strickland* prejudice.[6]

C. *Alleged double-jeopardy violation.*

¶ 28. As we have seen, Boyd argues that convicting him on bail-jumping counts based on criminal acts

___

[6] Boyd argues that the evidence of Washington's earlier brushes with the law was "necessary to rebut the state's false suggestion that Washington and Nickelson were innocent babes in the woods." Boyd, however, does not point us to anything in the Record where the State attempted to do that with either co-actor other than passing references to their youth. *Au contraire,* all three men—Boyd, Nickelson, and Washington were presented as the criminals Nickelson and Washington admitted to be, and as the jury found Boyd was. Further, Boyd has only made the WIS. STAT. RULE 906.08(2) argument in connection with Washington.

for which he was also convicted violated his double-jeopardy rights. He recognizes, however, that *State ex rel. Jacobus v. State,* 208 Wis. 2d 39, 53–54, 559 N.W.2d 900, 905 (1997), forecloses that argument, at least in our court. *See State v. Lossman,* 118 Wis. 2d 526, 533, 348 N.W.2d 159, 163 (1984). Accordingly, we do not discuss the issue.

D. *Alleged entitlement to an evidentiary hearing on Boyd's claims.*

¶ 29. Finally, Boyd contends that he should have an evidentiary hearing to further flesh out his claims. As we have seen, however, none of Boyd's contentions are supported by specific material facts *that are in dispute* so that an evidentiary hearing is needed. *See State v. Velez,* 224 Wis. 2d 1, 12, 589 N.W.2d 9, 14–15 (1999) (pre-trial motion, but applicable to postconviction motions as well). Thus, *State v. Allen,* 2004 WI 106, ¶ 24, 274 Wis. 2d 568, 585–586, 682 N.W.2d 433, 441–442, gives an example of what is and what is not sufficient to require an evidentiary hearing. In our *de novo* assessment and as we have already explained in the preceding sections of this opinion, the Record here "conclusively demonstrates that the defendant is not entitled to relief." *See id.,* 2004 WI 106, ¶ 9, 274 Wis. 2d at 576, 682 N.W.2d at 437. Remand for an evidentiary hearing is not warranted.

*By the Court.*—Judgment and order affirmed.